Thank you and good morning and welcome to the Ninth Circuit. Before we get started, I want to acknowledge that we have Judge Boggs here visiting with us from the Sixth Circuit who is helping us with these cases and Judge Hawkins and I would like to express our gratitude for you being here. Thank you. We have a number of cases this morning. A few of them are submitted which I'll recite for the record and then we'll get going with our argued cases. So the first submitted case is Hernandez-Saron v. Garland. That's case number 20-72870. We also have submitted Gonzalez-Perez v. Garland, case number 21-70262 and then the other three will be argued. Our first argued case will be United States v. Chaplin. My understanding is both counsel are appearing by video. Just one word of caution, in prior arguments we've had attorneys have audio problems and not be able to hear their opposing counsel. So if you have any issues, please don't sit in silence and suffer through and let us know so that we can get those corrected and you can have a full experience with your argument. So with that, please watch your time. We'll expect that you'll comply with the time limits and we will start with the Chaplin case and I believe Ms. O'Leary, you go first. Your Honor, I'm happy to go first but I represent the government. You're right. Sorry, my apologies. Mr. Poulsen. Hi, thank you. Excuse me for a loop there. May it please the court, my name is Dan Poulsen. I am the Assistant Federal Defender. Can the court hear me? Yes. Am I good? Okay. May it please the court, this is Dan Poulsen, Assistant Federal Defender representing Leo Chaplin. This is a direct appeal from Mr. Chaplin's convictions for violation of the International Parental Kidnapping Crime Act and this is a sufficiency of the evidence appeal. This case is sort of unusual from your typical IPCA prosecution in the sense that Mr. Chaplin is not alleged to have removed the children from the United States without the other parent's consent. Mr. Chaplin and the other parent, MDS, left the United States together as a family with the children in November of 2014. So at the time that the children were removed from the United States, the other parent, MDS, and Mr. Chaplin were still together and MDS enjoyed access to the children when they left. So this is a retention case. This is a case which required the government to prove that Mr. Chaplin kept the children from returning to the United States, that he retained the children in the Philippines and that he did so with the intent to obstruct the lawful exercise of MDS' parental rights. He hid them from her for four years, right? Is that a yes or no? Our position is that Mr. Chaplin did not unlawfully retain the children from coming back to the United States. Did he, listen to the question, did he or did he not keep the children from seeing their mother for four years? Well, if you look at the district court's order, which is what we're appealing, the district court relied heavily on conduct that occurred prior to the issuance of the Alaska court decision, which ordered him to return the children to the United States. Our position is that any conduct prior to that date, which was in January of 2016, is insufficient to show a violation of IPCA. It is not, I guess what I'm saying is that IPCA does not criminalize obstructing another parent's access to the children overseas. So I take it your argument is that the answer to my question is yes, but is your position in terms of the elements of the act, it doesn't matter? Correct. Well, our position is that the court couldn't rely on conduct that predated the issuance of the Alaska court order for the simple fact that Mr. Chaplin was litigating his parental rights in both the Philippines and the Alaska court system. There was competing claims about jurisdiction and that's not unusual. There's typically in child custody disputes, you have one parent asserting that they have, you know, superior legal rights over the other. But for you know, the government's burden was to prove that he is thwarting the ability of the other parent to return the children to the United States. And that's critical because in sustaining the constitutionality of IPCA, this court has held, in order for it to be a lawful exercise of Congress's Commerce Clause powers, there has to be something, there has to be an interference with the channels of commerce. Council, at page 26 of your brief, you say by the Chaplin began retaining the children from leaving the Philippines, he was doing so pursuant to the Philippine hold order. So is that a concession that at least as of that time, he was restraining, retaining them from leaving the Philippines? The problem is that there wasn't really any evidence that MDS was seeking the children's return to the United States. Um, she made a couple of visits in 2015. Well, but that could, could you answer the question that is, you, perhaps your argument is that, well, yes, he was retaining them from leaving the country, but she didn't want them, let's say. But at least, am I reading the brief correctly, that you agree that he was retaining the children as of the time of the Philippine hold order? Is that correct? Well, the question is what controls? Is he charged with violating MDS's parental rights as they were defined under the Alaska child custody order? Or was he interfering with his rights under Philippines law? And the district court, there are two things, aren't there, counsel, because you, you really won't answer the question. There's retention and there's obstruction of the parental rights. Aren't those two separate items? Uh, right. And I think that the court might be conflating those two things. So again, the IPCA does not criminalize obstructing another parent's access to their children outside the United States. Again, it's the awarding the ability of the children to come back to the United States. And, um, MDS did not make any, or didn't testify that when she visited the children in 2015, or even in 2017, that she was doing so with the, or that she was So again, there's no nexus there. It doesn't satisfy the elements of the offense. Um, you know, this is a case where the federal court, um, waded into some murky territory as to competing jurisdictional claims in an independent child custody case. But that's not to say that Mr. Chaplain's conduct violated IPCA. Um, and I think the district court erred also in finding that and basically what the district court did is the district court said that, um, Alaska could claim that it was the children's habitual residence, uh, under the hate convention. And that for, for that reason, the Alaska court order took precedent. The problem is that the term lawful parental rights under IPCA does not make any reference to any body of law. Um, and there is authority. We cited some second circuit cases that have said that in defining lawful parental rights, you are not confined, um, to custody orders that are issued by the children's habitual residence. Um, so, you know, and we go into this in more detail in the, in the brief, but essentially there are circumstances. Excuse me. I have a question. Uh, we're required to construe the facts in the light most favorable to the prevailing party here in a criminal case. That's the government. It wasn't at the government's theory that he, uh, your client convinced the mother to travel with the children to the Philippines under false pretenses that he fully intended once they got there and what she did separate the children from her. Um, and that separation lasted four years. Am I right about that? I think that goes to intent, but it doesn't go to conduct. Um, again, what efforts was MDS making to keep the children in the United States? So, I mean, counsel, both of us went to law school and both of us learned that there's a word. Yes. And there's word. No. The answer to my question is yes. Isn't it? No. Um, I don't, I would respectfully disagree your honor, uh, and as whether or not that conduct was what the district court was relying on and our position is that that's insufficient to satisfy the elements of the offense. But that was the government's theory, wasn't it? That was, I think, evidence that the government relied on. Was that the government's theory of prosecution? Uh, that's in part, I suppose. Yes. But again, I mean, thank you. The government's theory is one thing. The elements of the offense are something altogether different and that's our position. Counsel, I want to clarify one thing. Are you saying that for the retention for the conduct part that, um, we can't have a violation until there's a court order in place that's not complied with? Is that what you're saying? No, no. Um, and you know, there are cases there, you know, there's, there are many cases where the parent removes the children to another country where there is no existing court order. Um, and in that situation, it would be appropriate to refer to the Hague convention and decide whether or not, excuse me, and, uh, look at the Hague convention, decide which, uh, you know, what the laws were in the children's habitual residence in the absence of a court order, both parents enjoy equal access to their children. And there's certainly. That's all right. So I'm sorry. So that's our case, right? They go to the Philippines. There's no court order in place, establishing parental custody rights because they were, uh, uh, intact family. Um, and then things go sideways and she comes home because she can't get access to the children. And before any legal action gets filed in any country, he's emailing saying you're not getting the kids back in the United States. So why isn't that sufficient evidence? Well, actually I think that email was sent while the custody cases were pending. Um, and the statements that he made were that he felt like his wife was not an appropriate parent, that he felt that he was entitled to primary physical custody of the children. Um, I don't think any of that is sort of, uh, out of character for most, excuse me, for a typical child custody case. The question is whether or not MDS is trying to get the children back to the United States again. And I can't, I keep harping on that, but that is an essential element of the offense. And that's the, that's the element that is sorely in this case. All right. You're, you're basically out of time. So I'll stand down. Thank you. Good morning. I'm Alison O'Leary representing the government and greetings from Anchorage. Um, okay. My time's going. Thank you. Um, to start, I want to make something clear for the way this case was charged, uh, based on the questions. The United States only charged removal. Um, and, and so our, we presented some evidence that suggested at trial that Mr. Chaplin may have planned this ahead of time before the family left for the Philippines. Uh, but we did not charge a removal, only retention. And when I believe in closing argument, we said that we thought the Philippines, when Mr. Chaplin hid the children at Bob Jones's house, uh, after the plan separation. So just for the court's evaluation, I want to make sure that fact that I don't think I'd emphasized and it was clear, but if we go from that, then as a retention case, Mr. Chaplin did exactly what the IPPCA was intended to prohibit. He took advantage of a family vacations with intent to obstruct his, his now ex-wife from seeing them. The defense says there's no evidence of this, but there was substantial evidence of that. And the court has already referenced some of it, including the email that was sent, I think two days before the Alaska divorce and custody case was filed, telling the children's mother, he wasn't going to be returning them. She wasn't going to get her way, meaning have custody rights in Alaska. Uh, he moved the children around. Part of the counsel, at the time he said that, he was actually contesting her rights in Alaska, wasn't he? Or for a while, in effect, he was, he was fighting it out in Alaska at the time he said that, or am I, um, is that about right? In, in the email, not, not quite. He sent the email just before the Alaska divorce and custody case was filed. He then, he then did, as, as you said, contest the Alaska case. Uh, interestingly, he did not contest the divorce. He was happy to have Alaska. So do you think that he violated the act, uh, before any Alaskan court action? Oh, absolutely. Okay. Yes, absolutely. He violated the act as soon as he started keeping, uh, the children without their mother's consent for the purpose of inter, interfering with her rights. And that's because, uh, she had rights under the sort of default situation in Alaska, under Alaska law as a, you know, one of two parents who shared joint physical and legal custody. So she had legal rights when they arrived in the Philippines and those rights continued until the Alaska court, um, gave her greater rights in subsequent court orders. And, um, I think maybe this is a good time to jump into, uh, why it's the Alaska court's, uh, rules that, that matter. So as Mr. Bolton said, your position, is your position now really that while it's interesting, the Alaskan, uh, activities don't matter because he had already begun to Um, I mean, I certainly, I certainly think that could be a path to upholding the verdict because we charged a time frame that covers before the Alaskan court activities and after. Um, and I think there's sufficient evidence that he was violating the act before, you know, under the default Alaskan rules and then after the subsequent Alaska court order. The reason I'm asking this counsel is there's talk about the Hague convention, but nobody filed anything under the Hague convention. Am I right? Right. That's correct. And they couldn't have, because the Philippines is not a signatory to the Hague convention with the United States. So this is not a Hague convention country, right? This is, um, if it were a Hague convention country, uh, would that have made any difference? Should the mother have filed a Hague convention claim to return? And what would have been the effect if the Philippine court had said no? My, my major concern here in terms of the law is what would happen if you had a, a square conflict between the U.S. courts and a foreign court? Can the U.S. courts make a criminal decision, uh, based on contrary law in another country? So had there, had this been a Hague convention country, um, I don't, I don't think there's anything in the IPKCA that requires filing, um, a Hague convention action. But if they had, there are cases among the few that exist, uh, where there had been Hague convention, uh, filings, um, and you can end up in a situation where there are, like, conflicting petitions, uh, because the children have been taken back and forth and both times alleged on, on lawfully. Uh, but when that happens, that doesn't affect the IPKCA. The only thing I, I think could potentially matter is that because the IPKCA says it should be interpreted not to detract from the Hague convention, if there is a defense under the Hague convention that doesn't exist, like an affirmative defense that doesn't exist in the where not recognizing that defense to IPKCA could be a problem. Although there's only two affirmative defenses in the Hague convention, it's a, some sort of physical danger to the children and that affirmative defense is in the IPKCA, that's included. So that's not a situation. The Hague convention also has a defense for, um, a person who's not exercising their parental right. Well, I mean, there's also, speaking potentially, there's potential problem of the foreign court having a different view of habitual residence. In this case, you would certainly think they should not, but you know, you can certainly have circumstances where one country says the habitual residence is here. The other country says the habitual residence is not. And the reason I raise that is that there are several quotations about state law, and sometimes that's treated as meaning Alaskan state law, and I think that those quotations mean the law of a state that is a country. Do you have a view on that? I do. At least in terms of the Hague Convention, it describes what it means by those. It Hague Convention itself imagines countries that have multiple legal systems within them and provides instruction on what to do there. Are you talking about references to state law in the Hague Convention? Well, the quotation from that congressional report uses state law, and it seemed to me that there the reference is to the law of a contracting state, meaning a country, rather than Alaska as opposed to Vermont or something. Okay. No, I think I disagree. I think it has got to be a reference to states within the United States law, because otherwise it's not helpful. If it's just saying state law, then it doesn't provide a forum, because now you're left with is it the foreign state or is it United States law? So I think because it wouldn't answer the question it seems to be a response to, it's got to be a reference to state law, meaning a United State. Okay. I mean, I can look at that, but what I am referring to is the language which is quoted at page 30 of your brief, which is from the report, and then it says they are to be determined by with the Hague Convention. Okay, I can look at that. I have your point. Go ahead. Yeah, and you know, something to note there, right? The statute seems to suggest that the reference to state law is that that's what determines habitual residence, right? It says it shouldn't detract from the Hague Convention. That's what the Hague Convention does, and then to the extent that's ambiguous, if you go to the Hague Convention, it's abundantly clear that habitual residence is how you determine the parental rights. That's where you look for what those rights are. The defense has suggested that it doesn't actually detract from the Hague Convention if you don't do that, and I've got to respectfully disagree there as well. As the legislative history here, you'll see from the sponsors that the concern here was what parents, like the mother in this case, whose children are taken to a non-Hague Convention country, can do, right? The Hague Convention, or excuse me, the IPKCA helps bridge that gap by giving a remedy to those parents where there's no civil one. If you take that away, then those parents, or there's no incentive to join the Hague Convention and have that civil remedy, so it certainly does detract. I see that I have gone over my time. I have a few more points, but I can stop here. Yep, thank you. All right, we appreciate your argument. The case of United States v. Chaplain will be submitted.
judges: Boggs, HAWKINS, FORREST